Thank you, your honor, may it please the court. This morning I'd like to address two issues that arise from the district court's legal errors. The first issue is the district court's treatment of the claim term air quality, which was construed to mean only the concentration of pollutants and contaminants in the air. This construction is inconsistent with the intrinsic and extrinsic evidence that was presented to the district court. In addition, the district court erred when it concluded that there was a disavowal of the scope of this air quality term. The second issue is the district court's conclusion that two other claim limitations are indefinite. Those limitations are air quality sensor adapted to measure non-weather data and air quality sensor to measure environmental data. It is our position that those limitations are not insolubly ambiguous and are capable of a reasonable construction. If the claim construction of pollutants and contaminants is affirmed, it is our position that the claim limitations, the sensor limitations, non-weather and environmental data are still definite because they can be understood based upon the intrinsic evidence of prosecution history of the matter. They may have a different scope in terms of infringement, but they are definite claim terms. With respect to the air quality limitation, that term is a broad term that includes not only the things that we consider to be pollutants and contaminants such as carbon dioxide, carbon monoxide, particulates, volatile organic chemicals and the like, but it also includes temperature and humidity. And that broad definition or broad construction of air quality is confirmed in the prosecution history, supported by the patent and confirmed in the extensive evidence by the prior records before the district court. So the dispute on air quality really boils down to whether that term includes temperature and humidity together with pollutants and contaminants or whether it's limited solely to pollutants and contaminants as the district court limited the term. Let me address for a moment, if I might, some of the examiner's statements in the prosecution that show that the examiner understood air quality to be a broad term to include temperature and humidity. The examiner cited three different patents in connection with rejecting claims. The first patent was the FASIC patent. The examiner said as to the FASIC patent, that discloses at least one sensor for measuring air quality. And the examiner in his rejection cited to that portion of FASIC that refers to temperature, humidity and particulate sensors. Secondly, the examiner cited essentially for the same, cited the same way, the BINDA patent. The examiner said the BINDA patent discloses something or a sensor, a system for monitoring air quality and cited in connection with his rejection that part of BINDA that disclosed temperature, humidity, carbon dioxide and toxic gas sensors. So the examiner with respect to those two patents concluded that air quality was broad and included temperature and humidity. But he didn't stop there. The examiner also referred to and cited the Shelton patent. And in connection with the Shelton patent, the examiner made comment about one of the parts of the Shelton disclosure which talked about sensors located at the top of the city. And the examiner said those sensors, quote, allow for the detection of temperature, humidity, etc., different air quality attributes, close quote. That's found on page 1050 of the joint appendix. So throughout this, the examiner has taken a position from the examiner's own mouth that air quality is a broad term. The applicant's conduct during prosecution supports that. At one point, the examiner rejected some claims. The applicant, in responding to that rejection and commenting on the sensors, said that the sensors that are set forth in the specification talk about sensing smoke, carbon monoxide and temperature. Now this comment wasn't just made in the abstract. It was made in connection with the response to an examiner's rejection. What consequence flows from the fact that there is no example or mention of any temperature sensor or humidity sensor in the specification? We don't think there's any consequence, Your Honor, for the following reason. Granted, there is no specific reference to temperature or humidity sensors in the specification. The claims, however, are broad. And the independent claims are not directed to specific sensors, such as a temperature sensor or a humidity sensor. And we know that because- Even where the claim language is broad, our precedent is pretty clear on this, that there has to be some support in the written description for a broad meaning. We believe there is, Your Honor. On column 1, lines 18 and 19, the patent speaks to monitoring air quality for purposes of human comfort, health and well-being. And in the district court, prior art was presented to the district court, which said that when you're talking about comfort-related factors, when you're talking about health-related and well-being-related factors, those incorporate temperature and humidity as air quality terms. And the documents that refer to that not just are the patents that I mentioned a few moments ago, but U.S. EPA guidelines before the district court, the ASHRAE 62 and 55 standards that Honeywell itself relied on in the district court, Honeywell's own product manuals that say that comfort is an important aspect of air quality, and the ASHRAE standards speak to temperature and humidity as part of the comfort-related air quality factors. So we believe that all that is tied together in connection with the specification. More to the point, this court's precedent says that the claims are to be construed by a person of ordinary skill in the art, and that person of ordinary skill is a hypothetical person. This other prior art, the EPA guidelines, Brooks and Davis book, was before the district court, and other matters might be considered to be extrinsic because they were not associated with the prosecution. But at the same time, that is the body of knowledge and information that the person of ordinary skill brings to the table when he or she is looking at these claims to understand what the claims mean in the context of the specification. But you also have to go back and read the prosecution history. That's correct. That's the total aspect of understanding the claims. And in the prosecution history, now I'm reading from Appendix 8, 877, does the applicant's invention or its invention of air quality and the applicant's invention as far as the use of such sensors as smoke sensors, particle sensors, so on and so forth, such sensors produce an electronic signal proportional to the presence of a foreign substance. Is that a limiting statement? Is that pointless the way a foreign substance is as part of particles and contaminants? Well, I don't believe so, Your Honor, because I believe that the specification talks about sensors as examples of sensors in a preferred environment. And this is making reference to that. If one looks at Appendix Page A, 9A, one sees there the reference to the sensors, and particularly in the first paragraph on page 980, there's a sentence halfway down the paragraph that says, it may be desirable to immediately convert the resulting visual values to an air quality value. To do this, a digital value must be put into the context of what is being sensed,  So that's also found in the context of the specification. I'm sorry, in the context of the prosecution history. I'd like to turn for a moment to the disavowal issue. The district court concluded apparently that the pure choice disavowal brought meaning of air quality in connection with two patents, the Gilbert patent and the Shelton patent. As this court's precedent teaches us, disavowal has to be established through a clear, unambiguous, and unmistakable statement or action that indicates that there has been a restriction in the claim scope. And there's nothing of that type in this prosecution. With respect to the Gilbert patent, which was cited during the prosecution of the applicant's parent to the patent that is issued in this case, Gilbert describes a system for measuring inventory data at points of sale terminals and measuring power usage of refrigerators and washers and ovens and things like that. Gilbert doesn't once mention that it is measuring anything to do with air quality. It does make reference to temperature and it does make reference to something called physical variables indicative of pollution. But it never identifies those temperatures or those physical variables to be air temperature, air quality, or air pollution. All pure choice did when Gilbert was cited was to amend the claims. Prior to the Gilbert citation, the claim said at least one sensor for measuring environment data. Gilbert was cited, pure choice said, we're going to change all that to at least one sensor for measuring air quality data. There was no argument that air quality had any restriction associated with it. In fact, the claim was just limited to air quality in the broad sense. With respect to the Shelton patent, the same thing pertains. I mentioned a moment ago what the examiner felt about Shelton and the fact that it disclosed temperature and humidity as being different air quality attributes. When Shelton was cited, pure choice amended claims, but in those amendments did not argue the scope of air quality as being a deciding factor in connection with overcoming Shelton. So there's simply no statement, clear, unmistakable statement of disavowal in the prosecution history. In fact, we challenged Honeywell at the district court level to show such a statement. It didn't do it there, and it hasn't done it in its briefing here. I'd like to now finally turn to the indefinite misremembers. And really, my points here are, I can make them very quickly. Each of the sensor limitations is capable of a reasonable construction. They are not insoluble ambiguous. For example, the sensor adapted to measure non-weather data is self-defined. It is a sensor. It measures data, and that data doesn't relate to weather. Do you want to say anything? Yes, I would like to. Thank you. May it please the court. In Honeywell's view, air quality means the concentration of pollutants or contaminants in the air. This meaning is overwhelmingly supported by, first, the specification, second, prosecution history, and third, extrinsic evidence in the form of technical dictionaries and professional standards. In the specification column four, paragraph starting line 36, it talks about various sensors may be employed for testing various air quality attributes. It goes on to cite examples, and then ends by saying, the invention is not intended to be limited to the particular sensors described. Yes, Your Honor. In what respect, then, do you conclude that or in what way do you conclude that this is limited to simply predicament sensors or organic compound sensors? Your Honor, this is first deferred embodiments, and it's not the description of the products. I understand that. But nonetheless, it doesn't state that deferred embodiments are not intended to be limited. That's the invention. It's not intended to be limited. Well, it says the sensors are not limited to these particular types, these particular sensors. But what we have here is an enumeration of categories of different contaminants. And throughout this specification, particularly in the background of the invention, which in the hierarchy of evidence to look at carries even more weight than the deferred embodiments, we know that it's these contaminants, which is the theme that is the danger, the risk that this invention is designed to detect. I'd like to turn the Court's attention, if I could, to the crucial sentence. The crucial sentence in the background to the invention is a paragraph that's on lines 30 to 39. This is in column one. And the crucial sentence is, or two sentences, three sentences, is various filtering systems may be used to control air quality and to clear air or water of unwanted substances or residue. Clear the air or water of unwanted substances or residue. Different environments have different filtering requirements, depending upon the quality and quality requirements. I'm quoting exactly there. Thus, it is desirable to have a systematic device for monitoring air or water quality in order to effectively filter unwanted residue from a particular environment. That is, in our view, the most crucial sentence in the background to the invention because it's describing what this system is designed to get at. And what this system is designed to get at is to detect unwanted residue in the air. But that paragraph doesn't say that this is the only thing this system is intended to accomplish. There's nothing inconsistent with that statement relating to filtering out particular contaminants, etc. and the functioning of this system as well in monitoring other air quality attributes, such as temperature or humidity. I disagree. There's nothing in the specification, nothing in particularly the background to the invention, that in any way suggests that temperature or humidity are included in the attributes to be monitored. That would have been quite easy for the inventor to mention temperature or humidity in the specification. Well, I agree with you. In hindsight, I'm sure the faculty might have some different things to say in this written description. But nonetheless, here we are. But what about the language that was pointed to by Mr. Rupert in line 19 of column 1, the effect on the health and well-being of the population? That's a broad statement. Well, health and well-being, particularly if you're exposed to dust or contaminants in the air or any poison gases, those certainly affect the health of the population. Humidity and temperature can have effects, detrimental effects on the well-being, certainly the well-being of people. Your Honor, the feed... I'm sure we would all feel a little uncomfortable. Your Honor, the theme of this throughout is contaminants and residue and filtering out those contaminants and residue. The next two, three sentences in column 1, lines 20 to 29, certain environments are more susceptible to pollutants that negatively affect air quality, such as a bar, restaurant, nightclub, or casino, where a high percentage of people smoke. Other environments require a consistent and predetermined air quality which is free from pollutants, toxins, and chemicals, such as hospitals, nursing homes, pharmaceutical manufacturing facilities, or other manufacturing facilities that require clean rooms. There's simply nothing in here which suggests that this invention, in fact, is designed to get at detecting temperature and humidity. In a clean room environment, humidity or moisture in the atmosphere could be significant. It might well be significant, but this particular invention doesn't speak to that particular risk or factor in the air. There's a reason for that. This inventor was concerned about the prior work. The prior work certainly had systems that measured both contaminants in the air as well as temperature and humidity. And part of what's going on here is we have a... But you know, if you look at the prosecution history, as you just mentioned, there was a great deal of discussion about the prior work and the measuring of temperature and other weather-related factors and it would have been very easy for the applicant to have said to the examiner, wait, wait, wait, that reference is not relevant to this invention. All that reference relates to things like temperature, humidity, weather, etc. This invention has nothing to do with that. All it has to do with is particulates and other toxins. Well, Your Honor, they did that. They distinguished themselves from the Gilbert reference. The Gilbert reference measured temperature as well as pollution. And their distinction was, look, we have... Our sensors measure two different attributes, not one. The one that the patentee was referring to, the inventor was referring to, is the attribute of air quality in the Gilbert reference, not the temperature. That's exactly how they distinguished themselves from Gilbert in the prosecution history. In this court's jurisprudence, Your Honor... Mr. Baker, excuse me one second. Going back to Column 4, to the lines that were studied by George and Lynn, going to other sensors that produce an electronic signal, proportional presence, and so forth, does not intend to be limited to a particular sensor described. Is that description limited to history? Then expanded to include other type of sensors or other measurements being made by sensors? Your Honor, I think the limitation goes to the sensors as opposed to other types of contaminants. Is that the way that can be interpreted? I think that's the way it is interpreted, Your Honor. There may be other kinds of sensors, but what we have here is an enumeration of essentially a category of things. Judge Lynn points out that other sensors could be measuring temperature, humidity, and other ones. Is that the intent of that particular paragraph? Is that meaning that the sensors are measuring other types of inputs or the sensors themselves are measuring a particular type of inputs, limited to those type of inputs, outside of temperature and humidity, but in a different range by a different type of a sensor? Well, that I remember, because it says the particular sensors described, as opposed to, it doesn't say that the category of contaminants is limited to what is enumerated above. Throughout the specification, the recurring theme is contaminants and residue. If this patentee had wanted to have temperature and humidity covered by this patent, that would have been the place to have at least mentioned it. It's not mentioned at all in the specification, in the description, in the background to the invention, or in the refer to bodies. We turned to the specification. We demonstrated how in the Gilbert reference, they attempted to distinguish themselves, that is, this patent from the Gilbert reference, and the basis of the Gilbert reference had the two, had looked at both temperature as well as air quality. And there was a sensor for temperature and a sensor for air quality. And the way they distinguished Gilbert was to say, we've got two sensors that look at two different air quality attributes. So the implication from that is that temperature certainly was not part of their system. This paragraph that I mentioned earlier and that Judge Garrison was just asking about, on column four, around 1944, 45, et cetera, that's the same part of the specification that's referred to in the prosecution history that Mr. Rupert mentioned a moment ago, appendix page 898, where it says, as explained in connection with figures three and four, for any column four, line 44, through column five, line 49, some sensors produce an analog electrical output signal, et cetera, et cetera. It says, to do this, the digital value must be put in the context of what is being sensed, for example, smoke level, CO level, or temperature. Conversion of the digital value to a smoke level or temperature level, et cetera. Clearly, that's a discussion of another type of sensor that measures temperature, is it not? Your Honor, this is the one statement in the entire prosecution history that arguably supports the contingent of pure choice. This statement is, we would submit that at most, it is ambiguous, and that under this court's decisions, that you have... But what if we disagree with you and don't think there's any ambiguity at all? It still doesn't override, Your Honor, the specification. Under this court's decisions, the prosecution history is secondary to the specification. The specification here throughout is clear. It's residue and contaminants that is subject of the sensors. The sensors are attempting to detect residue. And Honeywell itself, this litigant, lost a case in this court on this very issue a few years ago in which the specification history, Honeywell relied upon a broad reading of the prosecution history in order to overcome specification. This court said no. The specification is clear. The invention is limited to a certain thing, fuel filters, and you can't go beyond that on the basis of statements in the prosecution history because the prosecution history is just less clear and less helpful to the process of understanding, letting the world know what is protected by the patent. That's why you have the specification described to the world so the world can be put on notice of what you're trying to protect. So if we submit the one statement in isolation, it cannot overwhelm the clear statements throughout the specification. The theme of the specification being residue and contaminants is what this system is designed to detect. When I read through this patent, and I've read it a few times, the theme that I find in this specification is really not focused on the sensors of a particular type of sensors. The theme I get is that this is an invention that recognizes that air quality and various characteristics of air can be sensed, gathered, and processed, and then the data transmitted to a central place where it can be collected and processed and examined, monitored, etc., etc. It's sort of a data gathering and collection apparatus, and what is gathered and how many sensors, where they're placed. That's sort of a gift. It could be anything you want. That's the theme that seems to come across to me. Why am I... I'm reading it too extensively, right? Your Honor, what you're reading, you're focusing on the sort of component parts, the mechanical devices, as opposed to what is it about. And we know what it's about by reading the background to the invention, which goes through what's the genesis of this. The genesis of this is that polluted air is a bad thing, and it's important in a host of situations to be able to detect what's in that air. Well, not only polluted air, it's water as well. Well, originally, yes, the device was limited to air and water, and then it was restricted... I mean, it's a wonderful patent because there's so much we can find about... Well, Your Honor, I would also say as well that you would not look to water temperature. That actually supports our reading of this patent. You would not look to water temperature for purposes of health. When you look at water temperature, water quality, you're looking at what's in the water for purposes of health. Your Honor, I see that I'm out of time. Thank you, Your Honor. I did not get to the entirety of my discussion on indefiniteness, but we'll rely on our brief for that point. I do have a couple of points that I would like to make in response to Honeywell's argument. My friend mentioned the Honeywell v. ITT case as being a case where they were relying on a broad specification, and this court held that the claims were not supported by the broad specification. The specification in that case was about a fuel filter. It said, this invention relates to a fuel filter. It was very specific. The only thing in that case was that the fuel filter, the component, had to be made from a particular polymer, and that particular polymer, when it was referred to in the specification, was always connected to the fuel filter, not the quick disconnects that Honeywell was trying to read its patent on. My friend also mentioned that Gilbert mentioned temperature as well as pollution. Gilbert talked about measuring temperature. Gilbert talked about measuring physical variables indicative of pollution, but Gilbert never once said that it measured temperature and those physical variables at the same time. In fact, pure choice distinguished Gilbert on two bases. The first basis I mentioned a few moments ago was on the air quality. The second basis was Gilbert only disposes censors to measure one type of attribute at a time. Mr. Baker mentioned that there is only one statement in the entire prosecution history that supports pure choice. Apparently, the counsel has neglected to consider what the examiner said on at least three separate occasions, again with respect to Fasig, Binda, and Shelton, where the examiner recognized clearly and unequivocally that temperature and humidity are air quality attributes. And finally, I would cite to this Court one of Honeywell's own documents, A1330, where Honeywell itself recognizes these same points. I'm not going to go into the substance of the document because it is a confidential document. If the Court has no further questions, we would ask that the construction of air quality be corrected and that the Court's final judgment of the claim indefinite be reversed. Thank you.